IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 2, 2019 Session

## STATE OF TENNESSEE v. JASON DOTY

**Appeal from the Criminal Court for Shelby County**
No. 15-02899      Lee V. Coffee, Judge

_____

### No. W2018-00701-CCA-R3-CD

_____


The Defendant, Jason Doty, was indicted by the Shelby County Grand Jury in count one for aggravated child abuse and in count two for "aggravated child neglect or endangerment" based on injuries that occurred to his three-month-old son. Following a jury trial, the Defendant was convicted of the lesser offense of reckless aggravated assault, a Class D felony, in count one and the indicted offense of "aggravated child neglect or endangerment," a Class A felony, in count two. After merging the reckless aggravated assault conviction into the aggravated child neglect or endangerment conviction, the trial court sentenced the Defendant as a Range I, standard offender to twenty-five years at 85 percent in the Department of Correction. The Defendant raises the following five issues on appeal: (1) Whether the trial court issued incomplete and misleading jury instructions that violated his constitutional right to a unanimous jury verdict; (2) Whether the evidence is sufficient to sustain his conviction; (3) Whether the trial court erred by not allowing the Defendant to cross-examine the State's child abuse medical expert about a prior dependency and neglect case involving the victim in which a juvenile court magistrate had found the expert's opinion less credible than the opinion of the opposing expert witness; (4) Whether the jury's verdicts finding the Defendant guilty of both reckless aggravated assault and aggravated child neglect are mutually exclusive; and (5) Whether the trial court imposed an excessive sentence. Following our review, we conclude that the conviction in count two must be reversed and remanded for a new trial because the Defendant's right to a unanimous verdict was violated. The Defendant's conviction for reckless aggravated assault is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part and Remanded

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Jason Doty.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Dru Carpenter and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of severe head injuries that the Defendant's three-month-old son sustained on the morning of March 30, 2015, after the Defendant's wife had left for work. The Defendant claimed that the victim fell from a changing table onto the floor, but physicians at Le Bonheur Children's Hospital, where the victim was taken for treatment, concluded that the victim's skull fracture and brain and optic hemorrhages were consistent with child abuse rather than an accidental fall. The Defendant was subsequently indicted for one count of aggravated child abuse and one count of "aggravated child neglect or endangerment."

At trial, Stephen Utley, a firefighter paramedic with the Memphis Fire Department, testified that he arrived at the Defendant's home early on the morning of March 30, 2015, to find the crying victim in the arms of another first responder. He assessed the victim, placed him in a spinal mobilization device, and transported him to Le Bonheur Children's Hospital. On cross-examination, he testified that the Defendant told him that the victim had fallen from a changing table and hit his head on the floor. He said he saw a slight redness in the victim's temporal area but did not notice any bruising.

Dr. Shiva Bohn, a pediatric ophthalmologist employed by Le Bonheur and an expert in the field of pediatric ophthalmology, testified she was called in on March 30, 2015, to consult on the victim, who had a skull fracture and a "brain bleed." Her examination revealed "dense blood" in all four quadrants of the victim's right eye with too many separate hemorrhages to count. The victim's left eye was in similar condition, with "hemorrhages in all layers of the retina, in all four quadrants [and] coming off the optic nerve[.]" The history she was provided was that the victim had fallen off a changing table. However, in her expert opinion, the victim's injuries were consistent with non-accidental trauma, or child abuse.

On cross-examination, Dr. Bohn testified that the victim's having a history of chronic subdural hematomas would not account for the degree of hemorrhages that she

observed. She said that the kind of bleeding she saw had other causes but most typically occurred in cases of "shaken baby syndrome." The hemorrhages were "quite fresh," and her educated guess was that the injury had occurred within twenty-four to forty-eight hours prior to her examination of the victim. When asked whether an increase in intracranial pressure could have caused the hemorrhages, she responded that increased intracranial pressure would have caused the victim's optic nerve to swell, which she did not observe.

Dr. Bohn testified that she took photographs of the victim's eyes with a retinal camera but did not have any of the photographs because someone had subsequently dropped and damaged the camera. She had, however, documented her observations in writing within minutes of her examination of the victim. She acknowledged that her employer, Le Bonheur, was a part of Methodist Hospital. She said she had no idea where the victim had been born. On redirect examination, she testified that she was not being compensated for her testimony.

Sergeant Anthony Lee of the Memphis Police Department testified that on March 30, 2015, he responded to Le Bonheur on a report of physical abuse involving the three-month-old victim. While there, he spoke with the victim's mother, Camille Doty, who gave him signed consent to search her home. No charges were filed that night. Instead, the investigation continued in a "team environment," during which information, including the victim's medical records, was gathered for review in the determination of whether charges should be filed. On cross-examination, he acknowledged that the Defendant opted to speak to him on March 30, 2015, despite having been advised of his rights and the fact that he did not have to speak with the investigators.

Retired Memphis Police Officer Hope Gray, who was assigned to the crime scene unit in March 2015, identified photographs she took of the victim's injuries and the victim's bedroom, including a wooden dresser with a changing pad on top and a shelving unit with an iPod. According to her measurements, the distance from the top of the changing pad to the floor was approximately three feet, and the distance from the left side of the changing table to the location of the iPod was two and a half to three feet.

The victim's mother, Camille Doty, testified that on March 30, 2015, she had been back to work for less than two weeks after her maternity leave that followed the victim's December 28, 2014 birth at Methodist Hospital. After she left for work that day, the Defendant called her in a frantic state to tell her that the victim had fallen off the changing table and that he was waiting for the ambulance to respond to his 911 call. She stated that both she and the Defendant were cooperative with the medical staff at Le Bonheur and that she gave the police signed consent to search her home. She identified photographs of the changing table/dresser and testified that the Defendant's usual routine was to lay the victim down on the changing table and then to turn on the iPod to play music during the duration of the diaper change.

- 3 -

Mrs. Doty acknowledged that the victim had sustained an injury to his face approximately one month prior to the March 30, 2015 incident. She testified that the prior injury occurred when the Defendant accidentally hit the victim's face with his head as he was bouncing the victim on his knee. She conceded she had provided a different explanation for that injury at a previous court hearing, testifying at that time that the Defendant had accidentally bumped the victim's head as he was carrying him through a doorway. She explained that she had gotten the two accidents confused and that the Defendant had not even been the person who was carrying the victim when the victim's head was accidentally bumped in the doorway.

On cross-examination, Mrs. Doty testified that the Defendant told her that the victim fell from the changing table when the Defendant momentarily moved away from him to turn on the iPod. She said that at the time of the March 30 incident, the victim had already demonstrated the ability to turn himself from his stomach to his back and had been very close to being able to turn from his back to his stomach. She stated that the victim was a full-term baby but was only four pounds, eight ounces at birth with a body that was "significantly smaller than his head," which led to a diagnosis of intrauterine growth restriction,[1] or "IUGR." She said the victim spent ten days in the Neonatal Intensive Care Unit before being discharged to home care. After his discharge, the victim was diagnosed with an umbilical hernia and with torticollis or a "stiffening of the neck muscles." As a result of the torticollis diagnosis, the victim started physical therapy "to teach him how to turn his head[.]"

Mrs. Doty testified that the growth of the victim's head continued to outpace the growth of his body after his discharge from the hospital but that he otherwise appeared to be a healthy baby. She said the victim had a number of medical appointments following his hospital discharge, including with a cardiologist to check on a heart valve problem, but none of the various physicians who saw him ever raised any concerns to her about signs of physical abuse. Finally, she testified that she had never done anything to harm the victim, never saw anyone else harm him, and never noted any bruises or other signs of abuse on his body.

Ashley Higginbottom, an investigator with the Department of Children's Services, testified that the Defendant provided her an account of the incident when she met with him on April 2, 2015, at Le Bonheur: The Defendant told her that he had set the victim down on the changing table, reached over to turn on the iPod, and turned back to find that the victim had rolled and was falling off the changing table. The Defendant stated that the

---

[1] One of the State's medical experts referred to this condition as "intrauterine growth retardation" rather than "intrauterine growth restriction."

victim hit the floor and that he "grabbed [the victim] up by the foot" as the victim was hitting the floor. The Defendant said that the victim's body was initially tense with his hands clenched but he then "went limp[.]" The Defendant told her that he responded by "shaking [the victim], trying to keep him alert, while he called 911."

Dr. Karen Lakin, an assistant professor of pediatrics at the University of Tennessee and the medical director for the "Le Bonheur Cares program," who was accepted as an expert witness in the field of general pediatrics and child abuse pediatrics, testified that she was asked to consult on the victim's case on March 30, 2015, by his primary physicians. As part of her consultation, she reviewed the victim's medical records dating from the time of his birth, examined the victim, and interviewed his caregivers. She testified that the victim was born with "Intrauterine Growth Retardation," or "IUGR," which meant that his birth weight and his length were low for his gestational age. In the victim's particular case, his head circumference was on the growth chart, measuring at approximately the tenth percentile, while "his length and his weight were less than the third percentile." After his birth, the victim briefly required oxygen, had problems with hypoglycemia, or low blood sugar, and had problems with thrombocytopenia, or low platelet counts. However, by the time of the victim's discharge from the hospital following his birth, his platelet counts had normalized.

Dr. Lakin testified that the Defendant told the Cares team that the victim had fallen off the changing table after the Defendant placed him down and turned away from the table. She said it was unclear at first whether the victim had hit the floor because at one point "there was a story about [the victim] started to fall, and [the Defendant] grabbed his leg." After their attempts to clarify, "the story was that his head hit the ground, and possibly his feet hit his face on the way down." The Defendant also said that the victim "arched his back" before his fall. Dr. Lakin testified that she also spoke with the victim's mother, who informed her of more of the victim's birth history, including that the victim had been treated for sepsis and pneumonia, which Dr. Lakin was able to confirm through medical records.

Dr. Lakin testified that the victim's only significant medical diagnosis following his discharge was torticollis, a tightening of the muscles on one side of his neck, which is sometimes the result of child's crib being located against a wall and the child always placed in the crib in the same direction. She said in such a case, a child's pediatrician will usually instruct the parents to alternate the position in which they lay the child down in the crib. Her physical examination of the victim revealed that he had "a very obviously large head in proportion to the rest of his body" and "very obvious bruising" on both sides of his face, with significant bruising on the left side of his face that started at his forehead, extended down over his left eye, and went down over his left cheek. The victim also had a skull fracture at the top of his head, subdural hemorrhages on both sides of his brain, a sclera hemorrhage, and "[e]xtremely severe" bilateral retinal hemorrhages.

Dr. Lakin identified the CT and MRI images that were taken of the victim's head, which were admitted as exhibits and published to the jury, and to which Dr. Lakin referred as she described the victim's various injuries. She said the CT scan showed that the victim had a "mixed density subdural hematoma," which indicated that some of the bleeding in his brain was the result of a separate trauma dating from several days previous to March 30, 2015. She was certain, for a number of reasons, that the mixed density subdural hematoma could not have been present from the time of the victim's birth. She explained as follows: first, birth-related subdurals are predominantly in a different region of the brain and are almost always gone within four to six weeks of birth; second, the victim was born via Cesarean section, which should not have resulted in any birth related trauma; and third, the ultrasound performed on the victim's head following his birth, which would have revealed any subdural hematomas, did not show any hemorrhages.

Dr. Lakin testified that the victim's multiple injuries were not consistent with the Defendant's account of a simple fall from a changing table. She said that although a child could get a bruise from a fall, the victim had a skull fracture on the top of his head, which was "not anywhere near where the impact appear[ed]" from the standpoint of the bruises on his face. In addition, the victim had other injuries that were "completely not supportive of short falls, which would be the mixed density subdurals and the severe retinal hemorrhages." Also, the Defendant reported that the victim had experienced some sort of seizure activity and had stopped breathing, which was "not consistent with a simple fall." Dr. Lakin opined that the victim's injuries were instead consistent with "[a]busive head trauma," which she explained meant "blunt force trauma to the head."

In response to questions from the jury, Dr. Lakin testified that the fact that the victim was born with a head that was larger than his body would not have caused his brain injuries. She explained that the victim's brain was "normal" and "on the growth chart" at the time of his birth, which meant that his mother's "body was trying to protect the baby" by "trying to protect the most vital structures to the fetus" such as the brain and vital organs. She then repeated her opinion that the victim's subdural hemorrhages resulted from non-accidental trauma:

> So, in my opinion, these represent traumatic injuries, and those injuries can be from blunt force trauma to the head, which is what I feel is -- would make sense with a skull fracture with no history of trauma. You can also get it from what we call severe acceleration-deceleration injuries, or what used to be called shaken baby syndrome. So, that severe and violent shaking of a child can give subdural hemorrhages, as well.

- 6 -

On cross-examination, Dr. Lakin acknowledged that there was some soft tissue swelling associated with the victim's skull fracture, which could indicate that it was a more recent fracture. She further acknowledged that the "skeletal survey," or full body x-rays of the victim, did not reveal any other fractures, either acute (recent) or occult (old) elsewhere on his body, and that the only bruising she observed was on the victim's face. Finally, she testified that the victim was "a well baby."

On redirect examination, she testified that the victim was "a well baby" in her opinion because he showed "excellent growth after his delivery," was not on any medications when he was admitted to the hospital on March 30, 2015, the common heart valve problems that he had exhibited at birth had spontaneously resolved, and he was by his parents' own description, "a great baby, happy baby, well baby."

The Defendant elected not to testify in his own defense but presented one defense witness, Dr. Michael Roy Weinraub, who was accepted by the court as an expert in the field of pediatrics. Dr. Weinraub testified that he had reviewed the victim's medical records and formed the opinion that the victim "was not a well infant on March 30th, 2015, when he fell off the changing table." He stated that the victim had mild osteopenia, or thin bones, which meant that his "bones [were] subject to fracture . . . with less force." In addition, the victim's head was "very large, and he had a chronic subdural hematoma," which was "pressing down on his brain . . . and . . . causing brain pressure." Because of that, the victim "was subject to injuries much easier than" the typical child without a chronic subdural hematoma or osteopenia. Dr. Weinraub explained why he formed the opinion that the victim's subdural hematoma was not of recent formation:

> Well, the size of it. For example, a chronic subdural, which is at, say, ten days to weeks to form. If it formed in ten days, that's a lot of fluid to build up in ten days, and would have caused symptoms in the child. We know, for example, that, in the hospital, in one day, I think the 31st of March, [the victim] had increased fluid while he was being observed by the doctors, and he was symptomatic. He became pale and lethargic because he had a sudden increase in fluid. So, there are symptoms that would have been seen with increasing fluid if it was all rapid. And there's nothing in the records that indicate[s] that [the victim] was a sick child and even showing symptoms of this -- of paleness or lethargy during the months before he fell.

> And so, it indicates to me that the collection of fluid was very slow and progressive and took weeks to form. I also have other ways of looking at that, that it took weeks to form, but that's my opinion, that this was a progressive problem over weeks and weeks, maybe going back to the time of birth.

Dr. Weinraub testified that the victim's "head was already expanded so much with the chronic fluid" that when he fell from the changing table and hit his head, his head was unable to further expand, thereby leading to a dramatic increase of pressure "on his brain under the cranial vault," which was "transmitted to the back of the eyes and caused the retinal hemorrhages[.]" He said the victim's skull fracture was a "clean" and "linear" fracture that occurred in his parietal bone, which is the most common area for skull fractures resulting from a fall. In addition, the victim's bone surveys showed no fractures in any other portion of the victim's body. He, therefore, opined that under the "very unusual set of circumstances" of the chronic subdural hematoma that existed in the victim's case, the victim's injuries, including his retinal hemorrhages and his skull fracture, were consistent with accidental trauma.

Dr. Weinraub further testified that "forty-six percent (46%) of term healthy newborns have a bleed on their brain at birth[,]" and approximately "thirty percent (30%) of them have retinal hemorrhages[.]" He said that although it typically results from "going through the birth canal[,]" it could also occur with a Cesarean section. His review of the victim's medical records made him believe it had occurred in the victim's case because Mrs. Doty was given Pitocin, a drug that causes uterine contractions, and underwent "hours" of uterine contractions before physicians made the decision to perform a Cesarean section. At the time of the Cesarean section, the medical team discovered that four or five loops of the umbilical cord were being compressed between the victim's body and the uterine wall, one loop of the umbilical cord was around the victim's neck, and the victim's head had become elongated to go through the birth canal, which indicated to Dr. Weinraub that "[the victim] was in that birth canal long enough, suffering enough, that he could have had a bleed on his brain, very likely."

Dr. Weinraub testified that another fact that indicated to him that the victim may have had a brain bleed from birth was that a spinal tap performed a few days after his birth revealed that his spinal fluid was "hazy." He explained that the hazy appearance of the spinal fluid could indicate one of three things: that the victim suffered trauma during the spinal tap itself; that the victim had an infection; or that the victim had a brain bleed at birth. He acknowledged that most bleeding at birth resolves spontaneously and cited a published study that found that of 101 newborns, forty-six had bleeding on the brain, and all but one of those forty-six "resolved completely by three months of age[.]" He stated that the same study showed that ultrasounds are unable to "pick up supratentorial subdural hematomas."

Dr. Weinraub testified that the victim's cardiologist had scheduled a CT scan of the victim's head, but the accident occurred before the scan could be performed. He said the cardiologist ordered the CT scan because on March 20, 2015, the cardiologist noted that

the victim had a swollen neck, head, and forehead veins, and wanted to rule out "an AV malformation," or a condition in which "blood flows to the brain too quickly and doesn't spread out." According to Dr. Weinraub, had the CT scan been performed before the victim's fall from the changing table, it would have revealed a chronic subdural hematoma rather than an AV malformation. The CT scan performed after the fall revealed "a chronic subdual with an acute component, [the victim] having fallen to the floor." Dr. Weinraub testified that "one of the most reasonable explanations" for the victim's enlarged veins was that "there was so much pressure on the 20th of March in his brain that the venous drainage from the brain was increased due to increased intracranial pressure." Had the CT scan been performed prior to the victim's fall, the cardiologist would have referred the victim to a neurosurgeon "for a designation of a treatment plan," which would have involved "tapping off some of the fluid" and using extra caution to prevent any falls. Finally, Dr. Weinraub reiterated his opinion, to a reasonable degree of medical certainty, that the victim's injuries were the result of his fall from a changing table and "naturally occurred physiological differences within the baby from time of birth through the first three months of his life[.]"

In response to a juror's question as to what would account for the bruises on the victim's face, Dr. Weinraub testified that one explanation would be if the victim "balled up" and his knees hit his face as he was hitting the ground. He said there was no record of the victim's legs or feet being bruised.

On cross-examination, Dr. Weinraub acknowledged that he was not board certified in child abuse pediatrics, had never examined the victim, and had been paid $7,500 as of the date of trial for his consultation work on the case, with additional payment forthcoming. He further acknowledged that the author of one of the studies he cited during his direct examination testimony, Dr. Rooks, had concluded that subdural hematomas after one month of age are unlikely to be birth related. At a juror's request, Dr. Weinraub read Dr. Rooks' conclusion aloud in its entirety:

> (Reading) Conclusion. Subdural hematoma is a common result of parturition, which means birth. I added that part -- a common result of parturition, and may be seen after vaginal and Cesarean delivery. MR imaging is more sensitive than ultrasound for the detection of subdural hematoma. The hemorrhages seen in asymptomatic term neonates are limited in size and location. Subdural hematoma after one month of age is unlikely to be -- unlikely to be birth related.

Dr. Lakin, testifying as a rebuttal witness for the State, agreed with Dr. Weinraub that the victim had a chronic subdural hematoma and that his head was expanding at a rapid rate as a result. She disagreed, however, that the chronic subdural hematoma was related to any type of birth injury. She explained that the victim's subdural hematoma was

worsening rather than resolving, which indicated that the victim had suffered "a much more significant traumatic injury" and perhaps multiple incidences of traumatic injury since birth:

> So, as both myself and . . . Dr. Weinraub referred to, the studies show that any type of subdural hemorrhages that occur at the time of birth are most likely resolved at one month of age, and, most certainly, in the study that he referred to, there was one case that was resolving at three months of age. So, one out of all the cases that they reviewed.

> One of the important points that I don't think I made a distinction the first time around is, again, the terminology and the descriptions are "resolving hemorrhages from birth trauma." So, that means that it's getting better.

> And, as Dr. Weinraub pointed out, and as you can see from the increasing head circumference, [the victim's] is not getting better. It was getting worse. So, in my opinion, getting worse means that you have a much more significant traumatic injury, possibly repeated episodes, and, as I showed you on the MRI, we have different compartments with different areas of bleeding. At the most, I can tell you there was more than one incident. I can't tell you how many more incidents there were. But we certainly know that the increasing head circumference was an indication that it was getting worse.

Following deliberations, the jury convicted the Defendant of the lesser offense of reckless aggravated assault in count one of the indictment and "aggravated child neglect or endangerment" in count two. At the conclusion of the sentencing hearing, the trial court merged the reckless aggravated assault conviction into the aggravated child neglect or endangerment conviction and sentenced the Defendant as a Range I, standard offender to twenty-five years at 85% in the Department of Correction.

## ANALYSIS

### I. Jury Instructions

The Defendant contends that the trial court erred in instructing the jury in several respects. Specifically, he asserts that (1) the trial court erred in instructing the jury that the Defendant was charged with "aggravated child neglect or endangerment"; (2) the trial court provided an improper definition of "knowingly"; and (3) the trial court improperly omitted an instruction regarding medical care in instructing the jury on aggravated child neglect.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)).

An erroneous jury instruction may deprive the defendant of his constitutional right to a jury trial. See Garrison, 40 S.W.3d at 433-34. As part of their instructions in criminal cases, trial courts must describe and define each element of the offense or offenses charged. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. Id. (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." State v. Clark, 425 S.W.3d 268, 295 (Tenn. 2014). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted).

## A. Aggravated Child Neglect or Endangerment

The Defendant contends that the trial court erred in instructing the jury regarding "aggravated child neglect or endangerment." He maintains that the trial court combined two separate crimes into one offense and that the trial court erred in failing to require the State to elect between the two offenses. The State responds that the inclusion of "or endangerment" in the instruction for the charge of aggravated child neglect was merely superfluous language that was harmless error.

## 1. Background

The title page of the indictment stated that the Defendant was charged with "Aggravated Child Abuse" and "Aggravated Child Neglect or Endanger." Count 2 of the indictment alleged that the Defendant,

> between December 28, 2014 and March 31, 2015 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully and knowingly, other than by accidental means, *neglect or endanger* [the victim], a child eight (8) years or age or less, so as to adversely affect the health and

- 11 -

welfare of the said child, such act resulting in serious bodily injury to said child, in violation of T.C.A. 39-15-402.

The trial court informed the jurors on multiple occasions that the Defendant was charged with "aggravated child neglect or endangerment" in Count 2 of the indictment. During voir dire, the trial court instructed the jury as follows:

> The second count of this indictment alleges aggravated child neglect or endangerment, and there are three essential elements that the State has to prove in that second count of this indictment.
>
> One, that the Defendant knowingly neglected or endangered a child, [the victim], so as to adversely affect the child's health and welfare.
>
> Secondly, the State has to prove that the act of neglect or endangerment resulted in serious bodily injury to [the victim].
>
> And, thirdly, that the child was eight years of age or less.

The trial court repeated these instructions as part of its preliminary instructions after the jury was chosen.

In the final jury instructions, the trial court instructed the jury as follows:

> Any person who commits the offense of Aggravated Child Neglect or Endangerment is guilty of a crime.
>
> For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the Defendant knowingly neglected or endangered a child, [the victim], so as to adversely affect the child's health and welfare; and
>
> (2) that the act of endangerment -- the act of neglect or endangerment resulted in serious bodily injury to [the victim]; and
>
> (3) that the child was eight (8) years of age or less.
>
> "Adversely affect the child's health and welfare" may include, but is not limited to, the natural effects of starvation or dehydration.

To constitute "neglect," the State must prove beyond a reasonable doubt that there was an actual adverse effect to the child's health and welfare. A mere risk of harm is not sufficient. Neglect is a continuing course of conduct, beginning with the first act or omission that causes adverse effects to a child's health and welfare, and can be an act of commission or omission.

The definitions for "serious bodily injury to the child," "serious bodily injury," "bodily injury," "child," "injury," "knowingly," and "intentionally" have been provided in these definitions. The requirement of "knowingly" is also established if it is shown that the Defendant acted intentionally.

The elements of Reckless Aggravated Assault, Child Abuse, Assault[,] and Reckless Endangerment have already been set out and explained in count one of these instructions.

In other words, ladies and gentlemen, those same lesser offenses that were defined for you in count one also apply to this charge, that is a greater charge, of child neglect or endangerment to count two. So, I'm not going to list that for you and define them all again, but, when you deliberate on this case, those same lesser offenses also apply to count two.

During closing arguments, the prosecutor argued that the evidence presented at trial established that the Defendant was guilty of "neglecting or endangering" the victim. The jury's verdict, as read by the trial court, stated that "we, the jury, find the Defendant guilty of aggravated child neglect or endangerment, as charged in count two of the indictment." As the thirteenth juror, the trial court affirmed the jury's verdict of guilt as to "aggravated child neglect or endangerment as charged in count two of the indictment."

## 2. Analysis

Tennessee Code Annotated section 39-15-402 includes three separate offenses: aggravated child abuse, aggravated child neglect, and aggravated child endangerment, all of which contain separate and distinct elements. The statute, entitled "Aggravated child abuse and aggravated child neglect or endangerment" provides in pertinent part:

(a)  A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and:

- 13 -

(1) The act of abuse, neglect or endangerment results in serious bodily injury to the child;

. . . .

(b) A violation of this section is a Class B felony; provided, however, that, if the abused, neglected or endangered child is eight (8) years of age or less, or is vulnerable because the victim is mentally defective, mentally incapacitated or suffers from a physical disability, the penalty is a Class A felony.

Tenn. Code Ann. § 39-15-402(a)(1), (b) (2014 & 2018).

Child abuse occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury." Id. § 39-15-401(a). Child neglect occurs when "[a]ny person . . . knowingly abuses or neglects a child . . . so as to adversely affect the child's health and welfare." Id. § 39-15-401(b). Finally, child endangerment occurs when "[a] parent or custodian of a child eight (8) years of age or less . . . knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child." Id. § 39-15-401(c).

Both the indictment and the instructions issued to the jury conflated the separate offenses of aggravated child neglect and aggravated child endangerment into a single offense of "aggravated child neglect or endangerment." The language used in the trial court's instructions mirrored the language used in the indictment. "Generally, two distinct offenses cannot be charged in the same count of an indictment." State v. Jefferson, 529 S.W.2d 674, 678 (Tenn. 1975), overruled on other grounds by State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980). Accordingly, "all crimes arising from the same incident that are not lesser included offenses of another crime charged in the indictment must be charged in separate counts." State v. Gilliam, 901 S.W.2d 385, 389 (Tenn. Crim. App. 1995); see Tenn. R. Crim. P. 8(a)(1), (b) (joinder of offenses in an indictment takes place "with each offense stated in a separate count"). "[T]he purpose behind the prohibition of a duplicitous indictment is the avoidance of the following dangers: (1) failure to give the defendant adequate notice of the charges against him; (2) exposure of the defendant to the possibility of double jeopardy; and (3) conviction of the defendant by less than a unanimous jury verdict." State v. Michael Burnette, No. E2005-00002-CCA-R3-CD, 2006 WL 721306, at *3 (Tenn. Crim. App. Mar. 22, 2006). "A duplicitous indictment does not remove jurisdiction from the trial court." Gregory Justice v. State, No. M2012-00183-CCA-R3-PC, 2013 WL 1965999, at *9 (Tenn. Crim. App. May 13, 2013) (citing State v. Lindsey, 208 S.W.3d 432, 438-39 (Tenn. Crim. App. 2006)). Challenges to duplicitous indictments must be raised prior to trial. State v. Jones, 589 S.W.3d 747, 757 (Tenn. 2019);

Lindsey, 208 S.W.3d at 439; *see* Tenn. R. Crim. P. 12(b)(2)(B) (providing that a claim that the indictment "fails to show jurisdiction in the court or to charge an offense" may be raised "at anytime while the case is pending" but that any other claim of defect in the indictment must be raised prior to trial).

The Defendant did not challenge the indictment based on duplicity prior to trial, and he does not raise such a challenge on appeal. However, his failure to challenge the indictment does not preclude our review of his claim that his right to a unanimous verdict was violated. The Defendant challenges the trial court's jury instruction, and while he did not object to the instruction at trial, he raised the issue in his motion for new trial. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for new trial and is not waived by the failure to make a contemporaneous objection." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996); Tenn. R. Crim. P. 30(b)).

In Tennessee, a defendant has a fundamental constitutional right to a unanimous verdict before a conviction may be imposed. See State v. Lemacks, 996 S.W.2d 166, 169-70 (Tenn. 1999); State v. Shelton, 851 S.W.2d 134, 137 (Tenn. Crim. App. 1993). Protection of this right may require special precautions by the trial court to ensure that the jury does not reach a "patchwork verdict" based on different offenses. State v. Forbes, 918 S.W.2d 431, 445-46 (Tenn. Crim. App. 1995).

The jury instructions, which were based on the language in the indictment, conflated two separate criminal offenses of aggravated child neglect and aggravated child endangerment into a single offense of "aggravated child neglect or endangerment." The trial court referred to the charge as "aggravated child neglect or endangerment" throughout its instructions, and the prosecutor also referred to the charge as "aggravated child neglect or endangerment" during closing arguments. The jury returned a guilty verdict for "aggravated child neglect or endangerment."

The State contends that the language "or endangerment" was superfluous and that no evidence of endangerment was introduced. We note that the prosecutor argued during closing arguments that even if the jury believed the Defendant's claim that the victim fell from the changing table when the Defendant briefly turned away, the Defendant's actions constituted "aggravated child neglect or endangerment." However, statements made in closing arguments are not evidence. State v. Gentry, 538 S.W.3d 413, 430 (Tenn. 2017). Neither the jury nor this court are limited by a prosecutor's claims of what evidence should serve as a basis for a criminal offense.

The State presented evidence that while in the Defendant's exclusive care, the victim suffered extensive head injuries that were inconsistent with a fall from a changing

- 15 -

table.  Rather, Dr. Lakin testified that the victim's injuries were consistent with "[a]busive head trauma" or "blunt force trauma to the head."  She also noted that evidence from the medical records of multiple instances of traumatic injury.  Based on this evidence, the jury could conclude that the Defendant engaged in action that endangered the victim and resulted in serious bodily injury.

Accordingly, it is unknown whether the jury's verdict was based upon a finding of neglect or a finding of endangerment.  "The jury's true decision is a matter of speculation." State v. Angela E. Isabell, No. M2002-00584-CCA-R3-CD, 2003 WL 21486982, at *4 (Tenn. Crim. App. June 27, 2003) (citing State v. Andrew P. Virges, No. 02C01-9206-CR-00124, 1994 WL 51420, at *3 (Tenn. Crim. App. Feb. 23, 1994)).  We conclude that the Defendant's right to a unanimous jury was violated.  Therefore, we reverse the Defendant's conviction for "aggravated child abuse or neglect" in count two and remand or a new trial. See State v. Smith, 492 S.W.3d 224, 227, 236-39 (Tenn. 2016) (reversing the defendant's aggravated assault conviction and remanding for a new trial based upon a violation of the defendant's right to a unanimous verdict due to the State's failure to properly elect an offense).

## B.  Knowing Instruction

The trial court instructed the jury that "'[k]nowingly' means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist."  The Defendant challenges the instruction as it relates to his conviction for aggravated child neglect and maintains that the trial court erred in instructing the jury regarding the "circumstances surrounding the conduct."  Although the Defendant did not object to the instruction as inaccurate at trial, he raised the issue in his motion for new trial. Accordingly, the issue is not waived for purposes of appeal.  See Faulkner, 154 S.W.3d at 58 (citing Lynn, 924 S.W.2d at 898-99; Tenn. R. Crim. P. 30(b)).  Furthermore, even though we have concluded that the Defendant should be afforded a new trial on the charge of aggravated child neglect, we review the issue in case of further appellate review.

Tennessee Code Annotated section 39-11-106(20) provides that

> "[k]nowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that circumstances exist.  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

"This definition contemplates that the term 'knowing' may be applied to three distinct types of statutorily-defined conduct—or the *actus reus*: (1) the nature of the defendant's conduct, (2) the circumstances surrounding the defendant's conduct, and (3) the result of the defendant's conduct." State v. Hanson, 279 S.W.3d 265, 276 (Tenn. 2009) (citing *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002)). Child neglect is a nature-of-conduct offense and not a result-of-conduct offense. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). The statute only requires that the act of neglecting the child must be knowing, and the defendant is not required to have any awareness of the likelihood that injury could result from the neglect. Id.

However, we need not determine whether the inclusion of the "circumstances surrounding the conduct" language in the instruction is error because we conclude that any error was harmless in light of the evidence presented at trial and in light of the jury instructions, which included a definition of "neglect" that focused on the nature of the conduct that led to the victim's injuries. See Faulkner, 154 S.W.3d at 58-59 (holding that include the nature-of-conduct and circumstances-surrounding-the-conduct language in a jury instruction for a result-of-conduct offense was harmless error and not a "misstatement of an element" of the offense). Accordingly, the Defendant is not entitled to relief regarding this issue.

### C. Neglect Instruction

The Defendant maintains that the trial court erred in failing to instruct the jury that "[n]eglect means a failure to provide medical care, proper supervision, or food or other basic necessities which creates a substantial or unjustifiable risk of harm." The Defendant, however, did not request this instruction at trial and did not raise the issue in his motion for new trial. Therefore, this issue is waived. See Tenn. R. App. P. 3(e); State v. Prater, 137 S.W.3d 25, 33 n.2 (Tenn. Crim. App. 2003) (concluding that the defendant waived his challenge to the jury instructions by failing to raise the issue in his motion for new trial).

### II. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction for aggravated child neglect. When considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt

beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the conviction for aggravated child neglect as it was charged in this case, the State had to prove beyond a reasonable doubt that the Defendant knowingly neglected the victim so as to adversely affect the victim's health and welfare, that the neglect resulted in serious bodily injury to the victim, and that the victim was less than eight years old. See Tenn. Code § 39-15-401(b), -402(a)(1). "'Serious bodily injury' includes . . . a fracture of any bone . . . subdural or subarachoid bleeding, retinal hemorrhage . . . [and] injuries to the skin that involve severe bruising[.]" Tenn. Code Ann. § 39-15-402(c).

We have previously explained with an illustrative example what is required for a child neglect conviction:

> In short, child neglect is composed of three essential elements: "(1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare." State v. Sherman, 266 S.W.3d 395, 404 (Tenn. 2008). . . .

- 18 -

Further, child neglect is a nature-of-conduct offense, not a result-of-conduct offense. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). The statute merely requires that the act of neglecting the child must be knowing. Id. By way of illustration, a defendant satisfies the mens rea for child neglect when he or she knowingly leaves a child in a car for more than eight hours, but the mens rea requirement is not satisfied if he or she was unaware the child was present in the car at the time. Id. After the knowing mens rea is established, then the next inquiry is whether the child suffered an adverse effect to the child's health or welfare. Id. If the child has suffered an adverse health effect as a result of defendant's knowing neglect, then the defendant has committed child neglect, regardless of whether the defendant knew what the result of the neglect would be. Id.

State v. Sherry Dewitt, No. M2015-00816-CCA-R3-CD, 2016 WL 6638857, at *7, *11 (Tenn. Crim. App. Nov. 10, 2016) (reversing conviction for aggravated child neglect, in case in which the defendant nanny was acquitted of aggravated child abuse but convicted of aggravated child neglect, on the basis that there was no evidence that nanny's failure to inform parents of baby's injury or seek medical treatment for the child "resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act(s)").

The Defendant cites the lack of any evidence that he delayed in seeking medical treatment in support of his argument that "the evidence did not establish beyond a reasonable doubt that [his] omissions following the alleged (but acquitted) abuse caused the victim's further injury." However, in this case, the neglect charge was not confined to any ongoing failure to seek medical treatment, and the State was not seeking two separate convictions for two separate acts of abuse and neglect such that each offense required a separate injury. Rather, the record reflects that the counts of aggravated child abuse and aggravated child neglect were alternative theories of guilt for the same continuing course of behavior.

The prosecutor argued during closing arguments that even if the jury believed the Defendant's claim that the victim fell from the changing table when the Defendant briefly turned away, the Defendant's actions constituted "aggravated child neglect or endangerment." However, statements made in closing arguments are not evidence. Gentry, 538 S.W.3d at 430. The jury is not bound by the prosecutor's argument in determining whether the evidence established guilt beyond a reasonable doubt. This court also is not bound by the prosecutor's argument in examining the sufficiency of the evidence. Rather, we must view the evidence in a light most favorable to the State and determine whether any rational trier of fact court have found the essential elements of aggravated child neglect beyond a reasonable doubt. See Jackson, 443 U.S. at 319.

- 19 -

When viewed in a light most favorable to the State, the evidence presented at trial established that while in the Defendant's exclusive care, the victim suffered extensive head injuries that were consistent with "[a]busive head trauma" or "blunt force trauma to the head." According to the State's medical experts, the Defendant's statements that the victim fell from a changing table was inconsistent with the victim's injuries. The Defendant also gave different accounts as to what occurred when the victim fell. Dr. Lakin also noted that evidence from the medical records of multiple prior instances of traumatic injury. We conclude that this evidence is sufficient to support the Defendant's conviction for aggravated child neglect.

### III. Limitation of Cross-Examination of State's Expert Witness

The Defendant contends that the trial court severely prejudiced his defense "by disallowing defense counsel from cross-examining Dr. Lakin based on her prior opinions." Specifically, he argues that he should have been allowed to inquire into a prior juvenile court dependency and neglect case involving the victim in which a magistrate found that Dr. Lakin's testimony was not as credible as the defense expert's testimony.

In considering this issue, we apply the rule that "admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). A trial court's exercise of discretion will only be reversed on appeal if the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). When determining admissibility, a trial court must first determine if the evidence is relevant. Id.; Tenn. R. Evid. 402. If the court determines that the evidence is relevant, it must then determine whether its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403; Robinson, 146 S.W.3d at 490.

Before the start of the trial, the trial court considered the State's motion in limine to exclude evidence of the juvenile court dependency and neglect proceeding involving the victim and the Defendant's motion in limine to prohibit "bad acts" evidence of the Defendant's crimes or the facts "surrounding the adoption of [the Defendant's] children." At the hearing, the prosecutor announced that the State had no objection to the Defendant's motion, and defense counsel agreed that he would make no mention of the dependency and neglect proceeding during opening statements. Defense counsel, however, expressed his desire to revisit the issue prior to Dr. Lakin's testimony. The trial court granted both

motions. With respect to the State's motion, the trial court ruled that, "for impeachment purposes, those questions that may have been answered inconsistently in another venue may certainly be asked on cross-examination."

In the jury-out hearing prior to Dr. Lakin's testimony, defense counsel argued that he was entitled "both in the qualification of the expert and as impeachment of that expert, to go into previous times in which she's testified in which her testimony was found to be insufficient, or less than sufficient[.]" Defense counsel pointed out that the juvenile court proceeding had involved the same two opposing expert witnesses and argued that he should be allowed to ask Dr. Lakin about the juvenile magistrate's having found that Dr. Lakin's opinion was less credible than Dr. Weinraub's because she failed to adequately consider the victim's pre-existing health conditions. The trial court denied the motion, finding that the probative value of such evidence was outweighed by the danger of unfair prejudice and that it "would absolutely one hundred percent (100%) invade the province of the jur[ors,]" who were "the exclusive judges of the credibility of witnesses and the weight to be given their testimony."

We can find no abuse of discretion in the trial court's ruling. The fact that a juvenile magistrate in a different and collateral proceeding found the State's expert witness more credible than the Defendant's expert witness has no bearing on the Defendant's instant criminal case. However, as the trial court observed, evidence of the magistrate's credibility determination and/or conclusion with respect to that separate proceeding had a great potential to unfairly prejudice the State in the instant criminal case by confusing the issues and leading the jurors to believe that they were not the ultimate determiners of witness credibility. We, therefore, conclude that the trial court properly excluded this proposed line of cross-examination.

## IV. Mutually Exclusive Verdicts

The Defendant next contends that his aggravated child neglect conviction should be dismissed because it is "mutually exclusive" to his conviction for reckless aggravated assault. The State responds by pointing out that our supreme court has held that consistency between verdicts on separate counts of an indictment is not necessary, and that appellate courts will not disturb seemingly inconsistent verdicts. We agree with the State.

In State v. Davis, 466 S.W.3d 49 (Tenn. 2015), our supreme court rejected a defendant's argument that Tennessee should follow the minority of jurisdictions that differentiate between so-called "inconsistent" verdicts, in which a jury returns inconsistent convictions and acquittals on multiple counts against a single defendant, id. at 72, and "mutually exclusive" verdicts, in which a jury returns inconsistent verdicts on alternate counts arising from a single criminal conviction where "'a guilty verdict on one count

logically excludes a finding of guilt on the other.'" Id. at 73 (quoting United States v. Powell, 469 U.S. 57, 69 n. 8 (1984)). Our supreme court held that, regardless of the terminology, a defendant in Tennessee is not entitled to relief in either situation:

> We emphasize that "[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation." United States v. Zane, 495 F.2d 683, 690 (2nd Cir. 1974); see also Commonwealth v. Thomas, 65 A.3d 939, 944-45 (Pa. Super. Ct. 2013) (recognizing that "the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment" (quoting Commonwealth v. Stokes, 38 A.3d 846, 855 (Pa. Super. Ct. 2011)). Therefore, we reject the argument that we should alter our longstanding position of honoring and respecting a jury's verdicts, even when they are inconsistent.
>
> Moreover, as set forth above, the few jurisdictions that grant relief on the basis of "mutually exclusive" verdicts appear to struggle with both defining and applying the concept. We are disinclined to open the door to the increased confusion and increased litigation that arises from trying to parse a jury's inconsistent verdicts. Therefore, we hold that the Defendant is not entitled to any relief based on this argument.

Id. at 77. We, therefore, conclude that the Defendant is not entitled to relief on the basis of this issue.

## V. Excessive Sentence

Lastly, the Defendant contends that the trial court erred in sentencing by not properly considering a sentence of Community Corrections and by failing to take into account Mrs. Doty's sentencing hearing testimony about the negative financial and emotional impact a long sentence would have on her family. The State argues that the trial court properly imposed a within-range sentence of incarceration after considering the principles and principles of the Sentencing Act and finding that the Defendant was ineligible for a Community Corrections sentence.

Under the 2005 amendments to the Sentencing Act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

- 22 -

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701. Accordingly, we review the length of the sentences ordered by the trial court under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

To qualify for consideration for punishment in the community, an offender must meet all of the following criteria:

(A) Persons who, without this option, would be incarcerated in a correctional institution;

- 23 -

(B) Persons who are convicted of property-related, or drug-or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and

(F) Persons who do not demonstrate a pattern of committing violent offenses.

Tenn. Code Ann. § 40-36-106(a)(1).

At the sentencing hearing, the State introduced the Defendant's presentence report, which reflected that the forty-three-year-old Defendant had prior convictions for, among other things, domestic assault, assault, and violation of an order of protection. The State also presented one witness, the victim's maternal grandfather, Joseph Miller, who described his anguish over the suffering the victim had endured at the hands of the Defendant and the promise he had made to the victim that he would protect him from further abuse and pain. He said he witnessed the Defendant's anger and violence toward his daughter, himself, and the victim on April 14, 2015, when the victim returned home from the hospital. He stated that the Defendant had been convicted in the past of "multiple abuses to women and children" and requested that the trial court impose a lengthy sentence to protect the victim from further abuse at the hands of the Defendant.

Mrs. Doty testified on the Defendant's behalf that the Defendant, with whom she had two children, was a "loving, caring, kind" "teddy bear" of a man. Mrs. Doty said she was aware of the Defendant's history of domestic violence but had never seen any signs of violence in him and had never been concerned for the safety of herself or their children. She stated that it was hard for her financially without the Defendant and that she also wanted the Defendant present in the lives of herself and their sons so that they might know the love of their father.

The Defendant's aunt, Valorie Smith, described the Defendant's abusive childhood, his history of drug abuse, and the change in his behavior she had observed following his 2007 treatment and counseling at "the Jericho Project" and his subsequent marriage to Mrs. Doty. She said she had "never cut [the Defendant] slack" in the past when she saw him doing wrong, but she had never seen him be anything but loving and concerned about the

victim and sincerely believed that the victim had suffered an accidental fall. Finally, she stated that she would like to see the Defendant placed on Community Corrections.

At the conclusion of the hearing, the trial court found that the Defendant was statutorily ineligible to be considered for probation or any other alternative sentence, including Community Corrections, because aggravated child neglect is one of those convictions for which a defendant must serve 85% of the sentence pursuant to Tennessee Code Annotated section 40-35-501(k)(6)(b). The court further found that, even if the Defendant were eligible to be considered for a Community Corrections sentence, his convictions in the instant case against the victim, along with his history of violent convictions against others, would make him ineligible under the Community Corrections guidelines.

The trial court found as applicable enhancement factors the Defendant's history of criminal behavior and criminal convictions in addition to those necessary to establish his range, the fact that the victim was particularly vulnerable due to his young age, the Defendant's failure to comply with the conditions of a sentence involving release into the community, and the Defendant's abuse of a position of private trust. See Tenn. Code Ann. § 40-35-114(1), (4), (8), (14) (2014). The court found as a mitigating factor the Defendant's history of having an abusive childhood and the fact that he enjoyed "great family support." Tenn. Code Ann. § 40-35-113(13). The court applied great weight to the enhancement factors of the Defendant's criminal history, the victim's vulnerability, and the Defendant's violation of his position of private trust, and only slight weight to the mitigating factor. The court sentenced the Defendant as a Range I offender to four years for the reckless assault conviction and to twenty-five years at 85% for the aggravated child neglect conviction. The court merged the reckless aggravated assault conviction into the aggravated child neglect conviction, for an effective sentence of twenty-five years at 85 percent.

We find no error in the trial court's sentencing determinations. The record reflects that the trial court properly considered the enhancement and mitigating factors, imposed a sentence within the applicable range for the Defendant's offenses, and made detailed findings of fact in support of both the length and manner of service of the sentences imposed. The trial court based its denial of the Defendant's request for a Community Corrections sentence not only on his conviction in count two, which we have now reversed, but also on the Defendant's history of prior violent offenses against others. Accordingly, we affirm the sentence imposed by the trial court.

**CONCLUSION**

Based on the foregoing authorities and reasoning, we conclude that the Defendant's conviction for "aggravated child neglect or endangerment" must be reversed and remanded for a new trial. We affirm the Defendant's conviction for reckless aggravated assault as well as that sentence.

_____

ALAN E. GLENN, JUDGE